# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | |
|---|---|
| Ronald Dorrestein and<br>Christine S. Dorrestein,<br><br>      Plaintiffs,<br><br>vs.<br><br>William E. Schuiling and<br>Karen Schuiling,<br><br>      Defendants. | No. 2:17-cv-01193-DCN<br><br>**ORDER** |

This matter is before the court on defendants William and Karen Schuiling's (the "Schuilings") motion for summary judgment, ECF No. 22. For the reasons set forth below, the court grants the motion.

## I. BACKGROUND

This litigation arises out of a real estate sales contract, under which the Schuilings contracted to purchase a house and lot on Kiawah Island, South Carolina ("the Property") from the Dorresteins for $4,822,500. Compl. ¶ 3. The Dorresteins are husband and wife, and are residents of South Carolina. Id. ¶ 1. The Schuilings are also husband and wife, and are residents of Virginia. Id. ¶ 2. The parties entered into a written contract for the Property on February 1, 2017, at which point the Schuilings paid a $200,000 down payment, currently held in trust by the Dorresteins's real estate company, Kiawah Island Real Estate, LLC ("KIRE"). Id. ¶¶ 8–10. The Dorresteins chose not to complete the sale before it closed. Id. ¶¶ 11–12.

The Dorresteins allege that the Schuilings anticipatorily repudiated the

1

contract, and that their reasons for not closing on the property are not justified under the terms of the contract. Id. ¶ 18. The Dorresteins request specific performance of the contract, or alternatively, the $200,000 down payment in liquidated damages plus consequential damages. Id. ¶¶ 23–33. The Schuilings deny the allegations and argue that the contract was rendered null and void pursuant to the terms of ¶ 3, which requires membership in the Kiawah Island Club ("the Club") as a condition of purchasing the property. Def.'s Ans. ¶ 40. The Schuilings contend that their failure to make the deposit to the Club within five days of executing the contract rendered it null and void and excused them from having to close on the sale of the Property. Id.

The Schuilings also bring a counterclaim against the Dorresteins for breach of contract, arguing that the Dorresteins provided them with inaccurate information that fundamentally informed their decision to enter into the contract to purchase the Property. Id. ¶¶ 42–43. This purportedly inaccurate information included: the amount of traffic and construction in the immediate area around the Property; that the Property was built in compliance with Kiawah regulations and in line with the design plans and specifications; and that the property's dock was constructed pursuant to OCRM regulations. Id. ¶ 44. The Schuilings request the return of their down payment and consequential damages. Id. ¶ 48. The Schuilings also raise the affirmative defenses of unclean hands and mutual mistake, unilateral mistake, and/or recision. Defs.' Ans. ¶¶ 37–38.

The Dorresteins originally filed suit in this court on May 5, 2017. ECF No. 1. On October 18, 2017, the Schuilings filed a motion for summary judgment, ECF No.

22, to which the Dorresteins responded on November 13, 2017, ECF No. 31, and the Schuilings replied on November 17, 2017, ECF No. 32. The court held a hearing on this motion on November 27, 2017. ECF No. 36. This matter is now ripe for the court's review.

## II. STANDARD

Summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) of the Federal Rules of Civil Procedure requires that the district court enter judgment against a party who, 'after adequate time for discovery . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Stone v. Liberty Mut. Ins. Co., 105 F.3d 188, 190 (4th Cir. 1997) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, it may discharge its burden by demonstrating to the court that there is an absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The non-movant must then "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

Any reasonable inferences are to be drawn in favor of the nonmoving party. Anderson, 477 U.S. at 255, Webster v. U.S. Dep't of Agric., 685 F.3d 411, 421 (4th Cir. 2012). However, to defeat summary judgment, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence. See Anderson, 477 U.S. at 252; Stone, 105 F.3d at 191. Rather, "a party opposing a properly supported motion for summary judgment . . . must 'set forth specific facts showing that there is a genuine issue for trial.'" Bouchat, 346 F.3d at 522 (quoting Fed. R. Civ. P. 56(e) (2002) (amended 2010)). If the adverse party fails to provide evidence establishing that the fact-finder could reasonably decide in his favor, then summary judgment shall be entered "regardless of '[a]ny proof or evidentiary requirements imposed by the substantive law.'" Id. (quoting Anderson, 477 U.S. at 248).

### III. DISCUSSION

The Schuilings filed a motion for summary judgment on both causes of action

in the Dorresteins's complaint—specific performance and breach of contract. Defs.' Mot. Sum. Judg., 1. The Schuilings request summary judgment on both counts, arguing that "under the plain reading of the contract, it became null and void." Id. at 3. While parties may bring an action for specific performance of a contract under South Carolina law, Ingram v. Kasey's Assocs., 531 S.E.2d 287, 291 (S.C. 2000), specific performance is a potential remedy that the court could impose if it finds that a party breached a contract. Thus, the first task before the court is to determine whether to grant either party summary judgment on the Dorresteins's breach of contract claim against the Schuilings. The court will then determine whether to order the remedy of specific performance, as requested by the Dorresteins, or to order traditional damages, as requested by the Schuilings. Notably, neither party has requested summary judgment on the Schuilings's counterclaim against the Dorresteins for breach of contract.

The Dorresteins claim that the Schuilings breached the contract for sale by providing "unequivocal and written notice of their intent not to close" on the sale approximately four months after signing the contract. Compl. ¶¶ 29–33. The Schuilings argue in their motion for summary judgment that the lawsuit should be dismissed because of their failure to meet the requirements of § 3 of the contract, which they contend automatically rendered the contract null and void and of no further force and effect. Defs.' Mot. Sum. Judg., 3. Section 3 of the contract requires that the Schuilings, as the purchasers, obtain membership at the Club in the same classification of membership that the Dorresteins hold. This section requires that new purchasers of

property in the neighborhood obtain membership to the Club by submitting a "Conditional Application for Membership privileges, Club Membership Agreement, and the applicable Conditional membership deposit to the Membership Director at the Kiawah Island Club within five days after executing this Contract." Contract § 3, ¶ 2. If the purchaser is already a member of the Club, he or she may transfer this membership to the new property being acquired by: "(i) completing and signing the attached Conditional Application for Membership Privileges and a Club Membership Agreement for the same classification of Membership currently held by Purchaser; and (ii) submitting the same to the Membership Director at the Kiawah Island Club within five days after executing this Contract." Id. § 3, ¶ 3. To transfer membership from one property to another, the purchaser must also request in writing that the Club terminate the purchaser's previous membership, issue a new club membership connected to the new property, and transfer the purchaser's Club membership deposit to his new membership. Id. There are different categories of membership at the Club—most significantly for the purpose of this case, golf and social. If the purchaser currently holds a classification of membership that is different than the membership classification associated with the new property the purchaser wishes to acquire, then the purchaser "must first acquire the same classification of membership and then request that the Club change the Club membership classification." Id. § 3, ¶ 5.

The following portions of the contract provide the consequences for the purchaser failing to abide by the terms of § 3:

> The closing of the transaction contemplated under this Contract shall be contingent upon the undersigned Purchaser either transferring an

6

existing Club Membership to the property in The Settlement being purchased, or being approved for new membership in the club. **In the Event Purchaser does not submit a Conditional Application for Membership Privileges, Club Membership Agreement, and the required Conditional Membership deposit to the Club** as aforesaid within five days after executing this Contract, or the Purchaser's final Application for Membership Privileges is not acted upon favorably by the Club, then **this Contract shall immediately and automatically terminate, become null and void, and of no further force and effect.**

Should Purchaser's application for membership privileges in the club be denied, the downpayment and membership deposit shall be immediately refunded to the Purchaser. <u>IN THE EVENT THIS CONTRACT IS AUTOMATICALLY TERMINATED DUE TO PURCHASER'S FAILURE TO SUBMIT AN APPLICATION FOR MEMBERSHIP PRIVILEGES, CLUB MEMBERSHIP AGREEMENT, AND THE REQUIRED MEMBERSHIP DEPOSIT TO THE CLUB WITHIN FIVE DAYS AFTER EXECUTING THIS CONTRACT, SELLER MAY, AT SELLER'S OPTION, RETAIN THE DOWNPAYMENT AS AGREED LIQUIDATED DAMAGES FOR PURCHASER'S FAILURE TO COMPLY WITH THE TERMS AND PROVISIONS OF THIS CONTRACT, AND BOTH PURCHASER AND SELLER AGREE TO EXECUTE A WRITTEN RELEASE OF THE OTHER FROM THIS CONTRACT AND AN AGREEMENT TO HOLD KIRE HARMLESS, AND THE DOWN PAYMENT SHALL PROMPTLY BE RELEASED BY KIRE TO SELLER.</u>

<u>Id.</u> § 3, ¶¶ 6–7 (underline and all caps in the original, bold emphasis added).

At the time of the execution of the contract, the Schuilings were golf members at the Club in connection with their ownership of another home.[1] <u>Id.</u> § 3, ¶ 1. To purchase the Property at issue, the Schuilings were required by § 3 to either obtain a new golf membership for the new Property, or transfer their existing golf membership

---

[1] According to the deposition testimony of Jacqueline Allston, the Club's 30(b)(6) representative, Mr. Schuiling became a "golf" member of the Club in 2013 in connection with his purchase of another property in the development, but that in May or June of 2017, he downgraded his membership from golf to social, which has lower membership fees. ECF No. 31-6, Allston Dep. 14:1–17:24. Thus, at the time of the execution of the contract, February 18, 2017, it appears that Mr. Schuiling possessed golf membership at the Club.

to the new Property. The requirements for either procedure are essentially the same—namely, to submit the Conditional Application for Membership Privileges and the Club Membership Agreement to the Club within five days after execution for the contract. The key difference is that those transferring membership need not submit the Conditional Membership Deposit, but do need to submit a letter requesting that their current membership be transferred. The Schuilings did not obtain new club membership, nor did they transfer their existing club membership to the new property.

To obtain new club membership in connection with the Property, the Schuilings would have had to make a $5,000 deposit, which the parties agree that they never did. The Schuilings assert multiple times in their motion for summary judgment that they "failed to make the conditional membership deposit within five days of execution of the contract" and "did not obtain their own 'golf' level Club membership for the home." Defs.' Mot. Sum. Judg., 3. The Dorresteins admit that the Schuilings "failed to transfer their membership or pay the $5,000 initial deposit." Pls.' Resp., 6, 11.

The Schuilings did not follow the § 3 procedures for transferring their membership either. The Schuilings did not submit the letter requesting that their membership be transferred. Tr. 3:14–24, 34:23–35:13. They claim that they desired to keep their membership attached to their original property, and that they only filled out the membership application because they considered obtaining new membership for the new Property, but ultimately decided against it and did not submit the $5,000 deposit. Id. 4:9–6:1.

The Dorresteins argue that the Schuilings cannot invalidate the contract based

on their failure to abide by the terms of § 3. Pls.' Resp., 10. The Dorresteins argue that this failure is a breach by the Schuilings, which subjects the Schuilings to liability to the Dorresteins and entitles the Dorresteins to specific performance of the contract. Id. at 12. The Dorresteins also contend that this is an insufficient basis for invalidation of the contract because of the Schuilings's duty of good faith, and because all of the parties and other relevant people continued to act as though the contract was not null and void even after the Schuilings failed to comply with the terms of § 3. Id. at 14–17. According to the Dorresteins, the real issue is that the Schuilings anticipatorily repudiated the contract and refused to close the sale in a manner not permitted by the contract, and that this entitles the Dorresteins to specific performance, or in the alternative to the $200,000 down payment plus consequential damages. Id. at 1–3, 6–10. However, none of these arguments are relevant if the court finds that the contract was null and void prior to the Schuilings's repudiation because of the Schuilings's non-performance of the requirements of § 3 within five days of the execution of the contract.

"In construing a contract, the primary objective is to ascertain and give effect to the intention of the parties." Southern Atl. Fin. Servs., Inc. v. Middleton, 562 S.E.2d 482, 484–85 (S.C. Ct. App. 2002), citing Williams v. Teran, Inc., 221 S.E.2d 719, 722 (S.C. 1973). This intent must be determined by the contract language, Schulmeyer v. State Farm Fire & Cas. Co., 579 S.E.2d 132, 134 (S.C. 2003), "and if such is perfectly plain and capable of legal construction, such language determines the force and effect of the instrument," Superior Auto. Ins. Co. v. Maners, 199 S.E.2d 719, 722 (S.C. 1973).

See also Ellie, Inc. v. Miccichi, 594 S.E.2d 485, 493 (S.C. Ct. App. 2004) ("If the language is perfectly plain and capable of legal construction, it alone determines the document's force and effect.") Courts must interpret the contract language in its "natural and ordinary sense." Blakeley v. Rabon, 221 S.E.2d 767, 769 (S.C. 1976).

An ambiguous contract is one that could have multiple interpretations or that is "unclear in meaning because it expresses its purpose in an indefinite manner." Klutts v. Resort Realty, Inc. v. Down'Round Dev. Corp., 232 S.E.2d 20, 25 (S.C. 1977). Determining whether a contract is ambiguous is a question of law for the court. S.C. Dep't of Nat. Res. v. Town of McClellanville, 550 S.E.2d 299, 302–03 (S.C. 2001). After determining that contract language is ambiguous, the parties may admit evidence to demonstrate the intent behind the contract, at which point the determination of intent becomes a question of fact. Id. Otherwise, "the construction of a clear and unambiguous [contract] is a question of law for the court." Id. Thus, where a contract is not ambiguous, but is rather "clear and capable of legal interpretation, the court's only function is to interpret its lawful meaning, discover the intention of the parties as found within the agreement, and give effect to it." Heins v. Heins, 543 S.E.2d 224, 230 (S.C. Ct. App. 2001). Furthermore, "[t]he court must enforce an unambiguous contract according to its terms, regardless of the contract's wisdom or folly, or the parties' failure to guard their rights carefully." Ellie, 594 S.E.2d at 493.

Here, the court finds that the contract is not ambiguous, and thus the plain language of §3 governs. Section 3 states that if the requirements for obtaining club membership are not met, "then this Contract shall immediately and automatically

terminate, become null and void, and of no further force and effect." Contract §3, ¶ 6. It further states that if the requirements are not met and the contract is then automatically terminated, "the Seller may, at seller's option, retain the downpayment as agreed liquidated damages . . . and both purchaser and seller agree to execute a written release of the other from this contract . . . ." Id. § 3, ¶ 7. This section clearly provides that the remedy for the automatic termination of the contract under § 3 is for the Dorresteins to retain the down payment. This section says nothing about specific performance as a remedy for automatic termination of the contract due to the Schuilings's failure to meet the § 3 requirements.

The Dorresteins, in support of their request for specific performance, point to § 10 of the contract:

> In the event of a default in the performance of any obligations of Purchaser pursuant to this Contract, <u>except as otherwise provided herein</u>, Seller (a) shall be released from any further obligations to Purchaser pursuant to this Contract and shall be entitled to (b) the remedy of specific performance whereby the Purchaser shall be required to perform, or (c) Seller shall be entitled to retain the Downpayment as agreed liquidated damages . . . .

Contract § 10, ¶ (a) (emphasis added). While § 10 grants the Dorresteins the remedy of specific performance if the Schuilings default on their obligations under the contract, the Dorresteins ignore the key phrase of "except as otherwise provided herein." Section 3 has "otherwise provided" the remedy to which the Dorresteins are entitled if the Schuilings default on their obligations under § 3—liquidated damages in the form of the down payment, if the Dorresteins choose to exercise that option.

The court finds that the Schuilings failed to meet the requirements of § 3 of the contract, automatically terminating the contract and rendering it null and void five days

after the execution of the contract on February 17, 2017. Thus, the Schuilings could not have breached the contract by their alleged "repudiation" in April 2017. The court grants summary judgment to the Schuilings on the Dorresteins's breach of contract claim. The court orders the parties to abide by § 3 of the contract, which allows the Dorresteins to retain the $200,000 down payment and requires both parties to agree to execute a written release of the other from this contract.

## IV. CONCLUSION

For the reasons set for above, the court **GRANTS** the motion for summary judgment.

**AND IT IS SO ORDERED**.

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**January 16, 2018**
**Charleston, South Carolina**